UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **TROY J. LEBLANC** | **05-10619** |
| DEBTOR | CHAPTER 7 |
| **THE MAGIC LAMP, L.L.C.** | ADV. NO. |
| PLAINTIFF | **05-1088** |
| V. | |
| **TROY J. LEBLANC, PLASTIC-PLUS AWARD CO., BRIAN CREERY, and AMERICAN GATEWAY BANK** | |
| DEFENDANTS | |

## MEMORANDUM OPINION

Magic Lamp, L.L.C. ("Magic Lamp") sued for a determination that debtor Troy Leblanc's liability to it is non-dischargeable under 11 U.S.C. §523(a)(2)[1] and (a)(6).[2]

---

[1] Bankruptcy Code section 523(a)(2):

>A discharge under section 727 . . . does not discharge an individual debtor from any debt ---
>
>\* \* \* \*
>
>(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>
>> (B) use of a statement in writing –
>>
>>> (i) that is materially false;
>>>
>>> (ii) respecting the debtor's or an insider's financial condition;

This lawsuit involves the circumstances leading to the cancellation of a mortgage bearing against immovable property LeBlanc sold before he filed bankruptcy. Plaintiff Magic Lamp held the note secured by the mortgage. It contends that LeBlanc willfully and maliciously caused the mortgage to be cancelled, fraudulently failed to disclose to it that the mortgage had been cancelled, and did not pay the mortgage debt from proceeds of the sale of the mortgaged property. The debtor denies any misconduct with regard to the Magic Lamp note and mortgage. He insists that he relied on the representations of Brian Creery, an employee of Bank of West Baton Rouge ("Bank"),[3] original holder of the note for the mortgage debt, to conclude that the mortgage debt had been paid, that the mortgage had been cancelled and that he was free to sell the property.[4]

This memorandum opinion gives the court's reason for rendering judgment for plaintiff Magic Lamp.

---

      (iii)    on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

      (iv)    that the debtor caused to be made or published with intent to deceive . . . .

[2] Bankruptcy Code section 523(a)(6):

    A discharge under section 727 . . . does not discharge an individual debtor from any debt ---

        \*    \*    \*    \*

    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

[3] Bank of West Baton Rouge is now known as American Gateway Bank.

[4] Claims against three defendants were dismissed before trial. Specifically, on motion of defendant Plastic-Plus Awards Company ("Plastics-Plus"), the court on September 30, 2005 dismissed plaintiff's claims against Plastics-Plus as a result of an earlier state court judgment in the company's favor. See P-25. The Bank and Creery settled with the plaintiff in March 2006. See P-49.

**Facts**

In late 1994, Scott Fruchter borrowed money from the Bank to buy a mini-storage warehouse facility in Ascension Parish, Louisiana named Nana's Spare Room. In December 1996, Fruchter transferred the property[5] to Louis R. Lindsay, Jr., who apparently assumed Fruchter's mortgage loan obligation to the Bank. After the sale, Lindsay made an unproven number of late payments on the loan, which troubled Fruchter, who at that time remained obligated to the Bank on the note. To eliminate the risk of further defaults, in October 1999 Fruchter acquired the note through Magic Lamp, which paid the Bank $81,664.11.[6] Magic Lamp then wrote Lindsay to advise him of the transfer of the obligation, and to demand prompt payment of future loan installments.[7]

In September 1999, the month before Magic Lamp acquired the note from the Bank, Lindsay transferred the property to Troy J. LeBlanc, the debtor. Fruchter and Magic Lamp apparently did not learn of the transfer until LeBlanc contacted Fruchter in late November 1999 to advise that he had bought the mini-storage warehouses from Lindsay and that future note payments should be made to Magic Lamp.[8] In response to a

---

[5] The transfer was a "1031 exchange," which is an exchange of property held for productive use in trade or business or for investment solely for property of like kind to be held in the same way and in which no taxable gain or loss is recognized. 26 U.S.C. §1031.

[6] Plaintiff's Exhibits 14 and 15. The endorsement was formalized in a Notarial Act of Endorsement and Assignment of Notes and Mortgages in 2001. Plaintiff's Exhibit 22. That act mistakenly was recorded in East Baton Rouge Parish, instead of Ascension Parish, where the property was located. The Bank's endorsement of the note to Magic Lamp also transferred to Magic Lamp the mortgage, as an accessory obligation. La. Civil Code art. 2645 ("The assignment of a right includes its accessories such as security rights.")

[7] Plaintiff's Exhibit 19. No evidence established the date of the transfer of the property to Magic Lamp, which Fruchter formed in 1999.

[8] Fruchter testified that he believed LeBlanc first contacted him with news of the transfer in December 2001, but the documentary evidence confirms that their initial contact was much earlier. LeBlanc's payments to Magic Lamp started in January 2000, which is consistent with testimony that the first contact occurred in late 1999. See Plaintiff's Exhibit 17.

request from LeBlanc or on his behalf, Fruchter for Magic Lamp wrote LeBlanc on January 3, 2000 to provide the monthly payment amount for the new year, a payout figure for the loan, and also to provide information LeBlanc needed for his tax return.[9] Magic Lamp sent LeBlanc a similar letter in January 2001.[10]

LeBlanc or someone acting at his direction made nineteen timely payments to Magic Lamp between January 2000 and August 2001, after which the payments stopped.

The parties dispute events surrounding cancellation of the mortgage securing Magic Lamp's obligation, which took place in connection with LeBlanc's sale of the property to Plastics-Plus in September 2001.

Troy LeBlanc testified that in 2001 he began thinking of selling the mini-storage warehouse property because he was not making any money from it. He started discussing a sale in June 2001 with an adjoining business, Plastics-Plus, and apparently began inquiries into paying the mortgage debt. Fruchter's wife, Gene Aguirre, wrote LeBlanc in August 2001 with payoff figures for the note.[11] LeBlanc testified that his former wife, Janelle LeBlanc, who acted as his secretary/receptionist, sent the letters at LeBlanc's request, after LeBlanc called to advise that he probably would be paying off the note in September 2001.

LeBlanc does not dispute that he made no payments on the note after August 2001. He testified that he stopped the payments because "it was brought to my attention that the note was paid in full." LeBlanc testified that he based his belief on information

---

[9] Plaintiff's Exhibit 20.

[10] Plaintiff's Exhibit 21.

[11] Plaintiff's Exhibit 23.

4

from several sources: (1) a conversation with Brian Creery; (2) communications with Penrose St. Amant, a lawyer and notary public representing Plastics-Plus; and (3) Janelle LeBlanc, who had obtained a copy of the Bank's affidavit of satisfaction of the mortgage.

Ms. LeBlanc was certain that Gene Aguirre (Fruchter's wife) sent her the affidavit of satisfaction of the Bank's mortgage debt, and was equally certain that the mortgage debt had nothing to do with the note LeBlanc was paying to Fruchter -- even though Aguirre had only recently sent LeBlanc a payoff amount for the note.

The debtor also testified that his mother, Joy LeBlanc, who was his bookkeeper, "figured out" that the note was paid off when inquiring about a payoff amount.

Plastics-Plus retained St. Amant to handle the closing. St. Amant prepared the purchase agreement,[12] and obtained a title abstract for the property. The abstract revealed a mortgage in favor of the Bank. St. Amant testified that at the time of the transaction with Plastics-Plus, he believed that the mortgage debt remained outstanding, because LeBlanc had assumed a balance of $84,149.10 on the debt when he bought the property in 1999, only two years earlier.[13]

In fact, the note had been endorsed to Fruchter, and remained outstanding. However, under circumstances that were not established at trial, Brian Creery of the Bank signed an affidavit that the note had been paid, had not been assigned, and had been lost or inadvertently destroyed.[14]

---

[12] Plaintiff's Exhibit 1.

[13] Plaintiff's Exhibit 2.

[14] Defendant's Exhibit 1. Although the lost note affidavit called for the signature of Scott Fruchter as the mortgagor, Fruchter did not sign it. Creery did not testify at trial.

5

St. Amant testified that it was his practice in real estate transactions involving encumbrances or title questions to obtain an affidavit of the seller of the property to be transferred, even though normally the clerk of court will cancel a mortgage inscription from the public record only upon presentation of a corresponding promissory note that has been marked "paid." Thus, despite having the Creery lost note affidavit, when LeBlanc insisted that the mortgage debt had been paid, St. Amant had LeBlanc sign an affidavit reciting that LeBlanc had paid the balance owed on the note associated with the mortgage.[15] St. Amant testified that he read the affidavit to LeBlanc, who also read it before signing. St. Amant reviewed the Bank's affidavit, and having satisfied himself that it met the statutory requirements for lost note affidavits,[16] he had the affidavit filed into the public record.

St. Amant testified that as the closing notary, he normally would have withheld funds from the sale proceeds to pay any outstanding encumbrance had there been sufficient proceeds to do so. Because the affidavits of the Bank and debtor indicated that the mortgage debt had been satisfied, St. Amant gave LeBlanc a check for net sales proceeds totaling $86,966.30.[17]

LeBlanc used the sale proceeds to pay taxes and other bills he owed personally, as well as those of his business, Ascension Fleet and Collision ("Ascension Fleet"). The payments included federal payroll taxes and parish sales taxes.

---

[15] Plaintiff's Exhibit 7. The affidavit referred to the note as one executed by Scott Fruchter accompanying a mortgage in favor of the Bank of West Baton Rouge.

[16] La. R.S. 9:5168(B) establishes the requirements for a valid lost note affidavit.

[17] Plaintiff's Exhibit 6.

Troy LeBlanc conceded that when he brought the property from Louis Lindsay, he made a down payment of $5000, then some additional payments which, combined with the initial payment, may have totaled $10,000. He also admitted assuming Lindsay's obligation to the Bank, which had a balance of more than $70,000, and admitted that he was responsible for paying the note.[18] LeBlanc also admitted that the debt owed to Magic Lamp was the same obligation as the Bank debt he assumed at the time he bought the property from Lindsay.

LeBlanc testified that he relied on his mother, as his bookkeeper, to prepare all checks for his signature, because he spent most of his time managing his repair shop. He claimed that his mother merely gave him checks to sign. LeBlanc at trial also sought to distance himself from personal dealings concerning the Magic Lamp obligation, by assigning all responsibility to his mother, whom he *did not* call to testify at trial. He stated that his mother managed a lot of the correspondence with Scott Fruchter, that he was not familiar with any correspondence from Magic Lamp concerning the obligation, and in fact had never spoken with Fruchter.

After LeBlanc stopped making payments, Fruchter eventually learned that LeBlanc had sold the property and the mortgage had been cancelled. Magic Lamp sued LeBlanc in state court to recover on the note, and for relief against other parties involved in the transaction.[19] LeBlanc's bankruptcy petition stayed the state court litigation.

---

[18] The defendant offered absolutely no documentary proof of payments he contends he made to the Bank on the note. He also testified that he did not know whether he had made any payments to the Bank after it endorsed the note to Magic Lamp.

[19] See footnote 3, above.

**Analysis**

I.   Plaintiff Failed to Prove Entitlement to Relief Under 11 U.S.C. §523(a)(2)(A).

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt for money, property, services or credit to the extent it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." To render a debt non-dischargeable under section 523(a)(2)(A), a creditor must prove that:

(1) the debtor made the representations;

(2) at the time they were made the debtor knew that they were false;

(3) the debtor made the representations with the intention and purpose to deceive the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained losses as a proximate result of the representations.

*Matter of Quinlivan*, 434 F.3d 314, 317 (5th Cir. 2005).

Lindsay, and not the debtor, initially incurred the debt to Fruchter, predecessor in interest to Magic Lamp. The debt pre-dated LeBlanc's relationship to Magic Lamp. Therefore, the debtor could not have made any representations to Magic Lamp to obtain the debt. Nor is there any evidence that Magic Lamp extended or renewed credit to LeBlanc based on anything the debtor represented to Fruchter or anyone else acting for Magic Lamp. Accordingly, no evidence supports a conclusion that the debt represented by the promissory note is non-dischargeable under 11 U.S.C. §523(a)(2).

>   II.   Plaintiff is Entitled to Judgment under 11 U.S.C. §523(a)(6).
>
>   a. Legal Standard

A debt is non-dischargeable under 11 U.S.C. §523(a)(6) if it results from "willful and malicious injury by the debtor to another entity or to the property of another entity." An injury is willful or malicious within the meaning of section 523(a)(6) where there is either an objective certainty of harm or a subjective motive to cause harm. *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998). The statute encompasses a wrongful sale or conversion by the debtor of encumbered property. *In re Modicue*, 926 F.2d 452, 453 (5th Cir. 1991).

>   b. LeBlanc Knew He Remained Indebted to Magic Lamp

Correspondence between Magic Lamp, through Fruchter, and the debtor establishes that no later than January 2001, LeBlanc knew that Magic Lamp held the note at one time held by the Bank. LeBlanc admitted knowing that the obligation to Magic Lamp was the same as the Bank note, and the record establishes that the debtor made note payments to Magic Lamp until about the September 2001 sale to Plastics-Plus.

LeBlanc's claim that he believed the note was paid in full before he sold the property to Plastics-Plus is absolutely not credible, for several different reasons.

First, Troy LeBlanc's responses on cross-examination were evasive. Specifically, he repeatedly sought to place sole responsibility for crucial decisions relating to the transactions on his mother, who apparently handled all his finances. LeBlanc claimed that he relied on his mother, who he testified had communicated with different persons concerning the note. In any case, he could not convincingly explain why he believed that his mother had "figured out" that the Magic Lamp note had been paid in full.

Next, Gene Aguirre's August 27, 2001 letter to LeBlanc conveying the loan payoff also betrays as totally unbelievable LeBlanc's testimony that he thought the obligation already had been satisfied. Indeed, Janelle LeBlanc, the debtor's former wife, testified that she requested the letter specifically *because* LeBlanc was considering a payoff.

Further, Mr. St. Amant, the closing notary, testified that LeBlanc told him "at least a dozen times" that the note had been paid. Yet on cross-examination, LeBlanc said that he had no idea how the note came to be paid off, or who paid it.

Finally, the debtor himself testified that he owed $70,000 on the obligation when he bought the property from Lindsay in 1999, only two years before he sold it to Plastics-Plus. The evidence established that LeBlanc had made only nineteen payments on the loan, which in combination totaled far less than the balance owed on the mortgage debt. Thus, the debtor knew, or should have known, that his mortgage debt remained substantial at the time of the Plastics-Plus sale, and in any case that it had not been paid in full, despite contrary information he claimed to have received.

Nor can the debtor rely on his former wife's testimony to justify his belief that the mortgage had been released, for it is also not credible. Janelle LeBlanc asked Gene Aguirre for a payoff amount, and Ms. LeBlanc also was familiar with Aguirre's August 2001 letter. Accordingly, Ms. LeBlanc obviously knew that the debtor was indebted to Magic Lamp, had been paying on his debt to it, and that the debt had not been paid in full. Despite this, she insisted that the Magic Lamp debt was not associated with the mortgage, and at trial even volunteered her opinion that LeBlanc was not liable to Magic Lamp because the note was payable to the Bank. In combination, these facts betray

10

Janelle LeBlanc's testimony in favor of her former husband as neither probable nor credible.

### c. LeBlanc's Mother's and Former Wife's Knowledge Is Imputed to the Debtor

The debtor cannot defend Magic Lamp's claims by claiming to rely on his mother and former wife, who both handled aspects of his financial dealings. The evidence established that LeBlanc's mother and former wife acted as his agents in connection with the sale to Plastics-Plus. Under Louisiana law, an agent's knowledge is imputed to the principal, even if the agent did not specifically convey the information to the principal. *Bell v. Demax Management, Inc.*, 824 So.2d 490, 493 (La. App. 4th Cir. 2002). Because the debtor made his mother his agent for financial matters, and Janelle LeBlanc his agent for dealing with other business matters, their knowledge regarding his business dealings is imputed to him, whether or not they gave him the information. Troy LeBlanc should have known what they did as his bookkeeper and secretary.[20]

In summary, the debtor knew or should have known that his obligation to Magic Lamp had not been satisfied when he sold the property to Plastics-Plus. Therefore, the debtor also knew or should have known that the affidavit from Brian Creery at American Gateway Bank was incorrect or false. Additionally, because LeBlanc knew that the note had not been paid, his affidavit declaring that it had been paid was either false or in reckless disregard of the truth. Mr. St. Amant stated that he would not have closed the sale to Plastics-Plus without the affidavits from, preferably, both the Bank *and* the debtor. LeBlanc's false statements and his implicit adoption of the inaccurate or false affidavit

---

[20] *Cf. Matter of Winkler*, 239 F.3d 746, 750-51 (5th Cir. 2001) (for purposes of a dischargeability action under 11 U.S.C. §523(a)(2), the intent to defraud can be imputed between partners, even though "innocent" partner asserts lack of knowledge of the fraudulent acts.) Under Louisiana law, partners are mandataries (or agents) of the partnership. La. Civil Code art. 2814.

11

from the Bank's employee, Creery, led to the closing without payment of the Magic Lamp obligation, and harmed Magic Lamp.

Alternatively, the evidence demonstrated that LeBlanc knew or was substantially certain that his acts – or those actions he failed to take – would harm Magic Lamp. LeBlanc therefore caused willful and malicious injury to Magic Lamp, and as a result his debt to Magic Lamp is non-dischargeable under Bankruptcy Code section 523(a)(6).

### III.     Plaintiff's Recovery

Magic Lamp's complaint sought both a declaration that LeBlanc's liability to it was nondischargeable, and also a money judgment for $79,502.00, plus interest and attorney's fees set forth in the promissory note.

The proper measure of damages under Bankruptcy Code section 523(a)(6) is "an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis." *Modicue*, 926 F.2d at 453. Where a plaintiff is harmed by the wrongful sale of encumbered property, the measure of the non-dischargeable injury is the fair market value of the property when it was sold. *Id*. This is so because, but for the debtor's conduct rendering the debt not dischargeable, the creditor would have received no less than the value of its interest in the encumbered property: that is, the amount it would have recovered through its mortgage on the property.

LeBlanc sold the mini-storage warehouse to Plastics-Plus for $90,000 in September 2001. The evidence established that the sale was arm's length. Thus, the sale is the best evidence of the property's fair market value at the relevant time. Therefore,

Magic Lamp will be awarded a separate non-dischargeable judgment against debtor Troy LeBlanc for $90,000.[21]

Baton Rouge, Louisiana, June 21, 2006.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[21] Magic Lamp also seeks recovery of attorney's fees incurred in the state court action and in this proceeding.  Under the Bankruptcy Code, creditors prevailing in a dischargeability proceeding have no right to recover attorney's fees: 11 U.S.C. §523(d) allows only prevailing *debtors* to recover fees.  A creditor can recover attorney's fees in a dischargeability action only when provided by a contract between the debtor and the creditor enforceable under state law.  *Matter of Luce*, 960 F.2d 1277, 1286 (5th Cir. 1992).  Magic Lamp has no right to recover its attorney's fees because here the basis for determining that the amount owed by the debtor is nondischargeable is not the note and mortgage, but rather the fair market value of the mortgaged property.

13